# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

**MONICA YOUNG**

        **Plaintiff,**

    **v.**                          **Case No.: 2:23-cv-37-JLB-NPM**

**JOHNSON & JOHNSON and
DEPUY ORTHOPAEDICS, INC.,**

        **Defendant.**

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COME NOW** the Plaintiff, by and through her undersigned counsel, and, for her complaint against the Defendants, allege as follows:

## I. PARTIES

1. Plaintiff, Monica Young, at all times material hereto was a citizen of the State of Florida and resided in North Fort Myers, in the County of Lee, at the time this action was filed, however, she has since moved to Massachusetts.

2. Defendant Johnson & Johnson is a corporation organized and existing under the laws of the State of New Jersey. Defendant Johnson & Johnson is the parent company of DePuy Orthopaedics, Inc. At all times relevant to this action, Defendant Johnson & Johnson has conducted business in the State of Florida and within the boundaries of the Middle District of Florida, with its principal

1

place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

3. Defendant DePuy Orthopaedics, Inc. is a corporation organized and existing under the laws of the State of Indiana.  At all times relevant to this action, defendant DePuy Orthopaedics, Inc. has conducted business in the State of Florida and within the boundaries of the Middle District of Florida, with its principal place of business located at 700 Orthopaedics Drive, Warsaw, IN 46581.

## II. JURISDICTION AND VENUE

4. This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C. § 1332(a)(1).  The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and no Defendant is a citizen of the same state as Plaintiff.

5. Venue is proper in this Court under 28 U.S.C. § 1391(c).

## INTRODUCTION AND SUMMARY OF ACTION

6. Plaintiff alleges on information and belief against DePuy Orthopaedics, Inc., and Johnson & Johnson.

7. Defendants manufactured the Pinnacle Hip Implant Device ("Pinnacle Device").  DePuy launched the Pinnacle Acetabular Cup System in 2001.  The Pinnacle acetabular shell was designed to accommodate either a polyethylene, metal, or ceramic liner.  The configuration at issue in this lawsuit is the use of

a metal liner with the Pinnacle acetabular shell, which is commonly referred to as the "Ultamet" liner or the "Pinnacle metal insert." Such a configuration, where the articulating surfaces of the femoral head and acetabular liner are both made of cobalt chrome molybdenum, is commonly known as a "metal-on-metal" hip implant.

8. The Pinnacle Device was designed, developed and sold for human hip joints damaged or diseased due to, among other things, fracture, osteoarthritis, rheumatoid arthritis, and avascular necrosis. The Pinnacle Device was designed and sold to provide pain relief and consistent and smooth range of motion. Defendants marketed the Pinnacle devices as having significant advantages over other hip devices and hip replacement systems. Defendants marketed and described the Pinnacle Device as "uniquely designed to meet the demands of active patients like you – and help reduce pain" and advertised it with pictures of a young woman trying on sneakers in an athletic shoe store, and other people engaged in athletic activities. Defendants advertised the Pinnacle Device as superior devices featuring "TruGlide technology", claiming the body would create a thin film of lubrication between surfaces and enabling "a more fluid range of natural motion."

9. Defendants also advertised and sold the Pinnacle Device as the best surgical option that "recreates the natural ball-and-socket joint of your hip, increasing stability and range of motion."

10. On information and belief, Plaintiff alleges that Defendants sold approximately 170,000 Pinnacle metal-on-metal devices. Defendants have stated in promotional materials that "99.9% of Pinnacle hip components are still in use today."

11. On information and belief, Plaintiff alleges that over 1,300 adverse reports have been submitted to the U.S. Food and Drug Administration (FDA) regarding failure or complications of the Pinnacle Devices.

12. On information and belief, Plaintiff alleges that Defendants are aware that Pinnacle Devices may result in metallosis, biologic toxicity and a high failure rate. Plaintiff further alleges that the Pinnacle Devices result in unsafe release of toxic metal ions into hip implant recipients' periprosthetic tissue and bone, and into the bloodstream and other organs. Plaintiff further alleges that Defendants are aware the metal particles from Pinnacle Devices results in tissue death, bone erosion and development of pseudotumors.

13. On information and belief, Plaintiff alleges that particulate debris from the Pinnacle Devices causes severe inflammation, severe pain, tissue and bone loss, and other related diseases.

14. Plaintiff further alleges that Defendants are aware that Pinnacle Device recipients have elevated cobalt and chromium levels greatly exceeding acceptable safety standards.

4

15. Plaintiff was implanted with the Pinnacle Device and has suffered substantial injuries and damage.

## FACTUAL ALLEGATIONS

### A.    The Pinnacle Device with An "Ultamet" Liner

16. The Pinnacle Device was developed for the purpose of reconstructing diseased human hip joints from conditions such as osteoarthritis, rheumatoid arthritis, avascular necrosis (AVN), fracture, and other degenerative conditions.   The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The hip joint is like a ball that fits in a socket.   The socket portion of the hip is called acetabulum.   The femoral head at the top of the femur bone rotates within the curved surface of the acetabulum.

17. The Pinnacle Device includes four components; the metal femoral stem is inserted inside the femur bone, the metal femoral head (or ball) connects to the top of the stem and then makes contact with a liner that is attached to the interior portion of the metal acetabulum cup (socket).   The acetabulum cup is comprised of titanium metal on its outer shell.   A plastic, ceramic, or cobalt-chromium metal liner is then placed on the inside of the acetabulum cup.   The metal femoral head rotates within the plastic, ceramic, or metal liner, depending on which liner the surgeon selects based on the patient's needs.   The cobalt-chromium metal liner is branded by Defendants as the "Ultamet." The Pinnacle Device with an Ultamet liner is a "metal-on-metal" device due to the

fact that both articulating surfaces - the femoral head (ball) and acetabulum liner (socket) - are comprised of cobalt-chromium metal.

**B.** **Defendants Did Not Seek Premarket Approval From the FDA and Thus the FDA Made No Finding That the Pinnacle Device Is Safe or Effective**

18. The Pinnacle Device is a Class III medical device. Class III devices are those that operate to sustain human life, are of substantial importance in preventing impairment of human health, or pose potentially unreasonable risks to patients.

19. The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938 ("MDA"), in theory, require Class III medical devices, including the Pinnacle Device, to undergo premarket approval by the FDA, a process which obligates the manufacturer to design and implement a clinical investigation and to submit the results of that investigation to the FDA.

20. Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and when relevant, packing and installation of, such device; samples

6

or device components required by the FDA; and a specimen of the proposed labeling.

21. The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

22. A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device -- is not required to undergo premarket approval. In addition, a medical device marketed after the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device (i.e., a device approved prior to May 28, 1976). This exception to premarket approval is known as the "510(k)" process and only requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

23. Rather than being approved for use by the FDA pursuant to the rigorous premarket approval process, the Pinnacle Device metal-on-metal total hip replacement system was cleared by the FDA the basis of Defendants' claim that, under section 510(k) of the MDA, it was "substantially equivalent" to another,

older metal-on-metal hip implant device that Defendants sold and implanted prior to the enactment of the MDA in 1976.

24. As such, under the 510(k) process, Defendants were able to market the Pinnacle Device with virtually no clinical or non-clinical trials or any FDA review of the implant for safety and effectiveness.

## B. **Defendants Took No Steps to Test the Pinnacle Device or They Would Have Discovered That It Leads to Metallosis and Other Complications Before Releasing it on the Market**

25. Had Defendants conducted proper clinical trials of the Pinnacle Device before it was first released on the market in the early 2000s, they would have discovered at that time what they ultimately learned in and around 2007 -- that the Pinnacle Device results in a high percentage of patients developing metallosis, biologic toxicity and an early and high failure rate due to the release of metal particles in the patient's surrounding tissue when the cobalt-chromium metal femoral head rotates within the cobalt-chromium metal acetabular liner. Plaintiff experienced this defect too.

26. In other words, implantation of the Pinnacle Device results in the nearly immediate systemic release of high levels of toxic metal wear debris and ions into every hip implant patient's periprosthetic tissue and bloodstream. This is because cobalt-chromium metal particles are released by friction from the metal femoral head rotating within the metal liner.   The particles then accumulate in

8

the patient's tissue surrounding the implant giving rise to metallosis, pseudotumors, and other harmful conditions, which was experienced by the Plaintiff too.

27. The formation of metallosis, pseudotumors, infection and inflammation causes severe pain and discomfort, death of surrounding tissue, bone loss and lack of mobility.

28. The problems with the Pinnacle Device are similar to the issues that gave rise to Defendants' recall of the ASR XL Acetabular System. Like the a Pinnacle Device, the ASR is also prone to early failure, and causes metallosis and cobalt toxicity resulting in serious health problems and the need for revision surgery. As a result, in August 2010, Defendants, in acknowledging the high failure rate of the ASR, recalled more than 93,000 ASR hip implants worldwide.

29. On information and belief, Plaintiff alleges that the FDA has received more than 1,300 adverse reports regarding problems associated with or attributed to the Pinnacle Device.

30. On information and belief, Plaintiff alleges that she and many recipients of the Pinnacle Device are suffering from elevated levels of chromium and cobalt. Plaintiff further alleges on information and belief that Defendants are aware that certain recipients of the Pinnacle Device have significantly elevated levels or chromium and cobalt in amounts many times higher than acceptable or

recommended safety levels. Notably, both the ASR XL Acetabular System and the Pinnacle Device were designed by Thomas Schmalzried.

31. A number of governmental regulatory agencies have recognized the problems that are caused by metal-on-metal implants such as the ASR and Pinnacle Device. For instance, The Medicines and Healthcare products Regulatory Agency ("MHRA") in Britain investigated Defendants' metal-on-metal total hip replacement system after receiving widespread reports of soft tissue reactions and tumor growth in thousands of patients who had received these implants. MHRA has required physicians to establish a system to closely monitor patients known to have metal-on-metal hips by monitoring the cobalt and chromium ion levels in their blood and to evaluate them for related soft tissue reactions.

32. Similarly, the Alaska Department of Health recently issued a bulletin warning of the toxicity of Defendants' metal-on-metal total hip replacement systems. The State of Alaska, like the MHRA, identified the need for close medical monitoring, surveillance and treatment of all patients who had received these and similar metal-on-metal implants.

33. Despite the public knowledge to the contrary, Defendants' continued to misrepresent the Pinnacle Device as a high-quality, safe and effective hip replacement product in their marketing and promotional materials. This is despite the fact that Defendants have known for years that the Pinnacle Device poses a danger to patients that have it implanted.

34. In January of 2013, the FDA issued a proposed rule that would eliminate the "510(k)" option for metal-on-metal hip implants, including the Pinnacle Device, and require that any such devices be approved by the "pre-market approval" process which, unlike the 510(k) process, requires a showing of safety and effectiveness. In February 2016, that proposed rule became final. In May 2013, Defendants stated their intent to no longer sell the Pinnacle Ultamet liner after August of 2013, in effect carrying out a "soft recall" of the device.

**D.** **Plaintiff Was Implanted with a Pinnacle Device and as a Result Has Suffered Injuries**

35. On or about June 24, 2008, Plaintiff underwent a right total hip arthroplasty procedure and on or about December 2, 2008, Plaintiff underwent a left total hip arthroplasty procedure. A Pinnacle Device with an Ultamet liner was implanted in place of her right and left hip. Over time, the known and common problem of corrosion and friction wear is believed to have caused amounts of toxic cobalt-chromium metal debris to be released into Plaintiff's tissue surrounding the implants. After her surgeries, Plaintiff began experiencing pain and difficulty with her implants.

36. Eventually, Plaintiff needed revision surgeries to remove the defective Pinnacle Devices and replace them with another hip implant.

37. Plaintiff only recently became aware of the causal link between the injuries she has suffered and any wrongdoing on the part of Defendants due to the faulty and

11

defective nature of the Pinnacle Devices and the failure of Defendants to properly warn her and her physicians about the Pinnacle Devices' defective and faulty nature. Plaintiff was unable to make an earlier discovery of the causal link despite reasonable diligence because of Defendants' failure to properly warn her and her physicians about the Pinnacle Devices' defective and faulty nature, and their failure to issue any recall or take any other proactive action to date with respect to the injuries being caused to patients that have been implanted with a Pinnacle Device.   Rather than alert the public and the orthopaedic surgeon community to the problems associated with the Pinnacle Devices, the Defendants withheld and concealed that information.

38. All of the injuries and complications suffered by Plaintiff were caused by the defective design, lack of adequate warnings, construction and unreasonably dangerous nature of the Pinnacle Devices that were implanted in her. Had Defendants not concealed the known defects, the early failure rate, the known complications and the unreasonable risks associated with the use of the Pinnacle Devices, Plaintiff would not have consented to the Pinnacle Devices being used in her total hip procedures.

39. Consequently, because of Defendants' acts and omissions, Plaintiff has been harmed as a result of the Defendants' wrongful acts and omissions and files this suit to recover her damages, as described below.

12

## CAUSES OF ACTION

## NEGLIGENCE

40. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5 and 16 through 39.

41. Defendants had a duty to exercise reasonable care in the designing, researching, marketing, supplying, promoting, sale, testing, quality assurance, quality control and distribution of the Pinnacle Devices into the stream of commerce, including a duty to assure that the devices would not cause those who had it surgically implanted to suffer adverse harmful effects.

42. Defendants failed to exercise reasonable care in the designing, researching, marketing, supplying, promoting, sale, testing, quality assurance, quality control and distribution of the Pinnacle Devices into interstate commerce. Defendants knew or should have known that those individuals that had the devices surgically implanted were at risk for suffering harmful effects from it, including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Additionally, Defendants knew or should have known about the harmful effects from the need for a revision surgery to replace the devices with the attendant risks of complications and death from such further surgery.

13

43. The negligence of Defendants, their agents, servants and employees, included but was not limited to the following acts and/or omissions:

a.  Negligently designing the Pinnacle Devices in a manner which was dangerous to those individuals who had the devices surgically implanted;

b.  Designing, producing, creating and promoting the Pinnacle Devices without adequately, sufficiently or thoroughly testing it;

c.  Not conducting a sufficient testing program to determine whether or not the Pinnacle Devices were safe for use;

d.  Marketing and selling the Pinnacle Devices when Defendants knew or should have known that they were unsafe and unfit for use because of the dangers to their users;

e.  Selling the Pinnacle Devices without making proper and sufficient tests to determine the dangers to its users;

f.  Negligently failing to recall their dangerous and defective Pinnacle Devices at the earliest date that it became known that the devices were, in fact, dangerous and defective;

g.  Negligently producing the Pinnacle Devices in a manner that was dangerous to those individuals who had them implanted;

h.  Negligently assembling the Pinnacle Devices in a manner, that was dangerous to those individuals who had them implanted; and

14

    i.    Negligently under-reporting, underestimating and downplaying the serious dangers of the Pinnacle Devices.

44. Defendants were further negligent in the designing, researching, supplying, promoting, packaging, distributing, testing, and sale of the Pinnacle Devices in that they:

    a.  Failed to use due care in designing the Pinnacle Devices so as to avoid the risks to individuals that had the devices surgically implanted;

    b.  Failed to accompany their product with proper warnings;

    c.  Failed to accompany their product with proper instructions for use;

    d.  Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the Pinnacle Devices; and

    e.  Were otherwise careless and negligent.

45. Despite the fact that Defendants knew or should have known that the Pinnacle Devices caused harm to individuals that had the devices surgically implanted, Defendants continued to market, manufacture, distribute, and sell the Pinnacle Devices.

46. Defendants knew or should have known that consumers, such as Plaintiff, would suffer foreseeable injury and be at an increased risk of suffering an injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

15

47. Defendants' negligence was the proximate cause of Plaintiff's physical, mental and emotional injuries and harm, and economic loss, which she has suffered and will continue to suffer in the future.

48. By reason of the foregoing, Plaintiff experienced and will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Plaintiff had revision surgeries to replace the devices on or about May 2, 2017 and September 19, 2017.

49. In performing the foregoing acts and omissions, Defendants acted grossly negligent, fraudulently and with malice so as to justify an award of punitive and exemplary damages.

50. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5 and 16 through 39 as if fully set forth herein.

51. Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the Pinnacle Devices.

52. The Pinnacle Devices placed into the stream of commerce by Defendants were defective due to inadequate warnings, because Defendants knew or should have known that the Pinnacle Devices could fail early in patients and therefore give rise to physical injury, pain and suffering, debilitation and the need for a revision surgery to replace the devices, with the attendant risks of complications and

16

death from such further surgeries, but Defendants failed to give consumers and physicians adequate warning of such risks. Further, the Pinnacle Devices placed into the stream of commerce by Defendants were surgically implanted in a manner reasonably anticipated by Defendants.

53. As a direct and proximate result of Defendants' placement of the defective Pinnacle Devices into the stream of commerce, Plaintiff experienced and will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Plaintiff had revision surgeries to replace the devices on or about May 2, 2017 and September 19, 2017 and incurred medical expenses.

54. In performing the foregoing acts and omissions, Defendants acted with gross negligence, fraudulently and with malice so as to justify an award of punitive and exemplary damages.

## STRICT LIABILITY-MANUFACTURING DEFECT

55. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5, and 16 through 39 as if fully set forth herein.

56. Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the Pinnacle Devices.

57. At all times herein mentioned, the Pinnacle Devices designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were in an unsafe, defective and unreasonably dangerous condition at the time they left Defendants' possession.

58. At all times herein mentioned, the Pinnacle Devices were expected to and did reach the usual consumers, handlers and persons coming into contact with said product without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed, and marketed by Defendants.

59. The Pinnacle Devices that were surgically implanted in Plaintiff were defective in their manufacture when they left the hands of Defendants in that they deviated from product specifications, posing a serious risk that they could fail early in patients thereby giving rise to physical injury, pain and suffering, debilitation, and the need for revision surgeries to replace the devices which was done on or about May 2, 2017 and September 19, 2017.

60. As a direct and proximate result of Defendants' placement of the defective and unreasonably dangerous Pinnacle Devices into the stream or commerce, the Plaintiff has suffered and will continue to suffer substantial damages.

## **STRICT LIABILITY-DESIGN DEFECT**

61. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5 and 17 through 39 as if fully set forth herein.

62. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Pinnacle Devices that were surgically implanted in Plaintiff.

63. The Pinnacle Devices designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were in an unsafe, defective and unreasonably dangerous condition, which was dangerous to users such as Plaintiff who had the devices surgically implanted.

64. The Pinnacle Devices designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were in an unsafe, defective and unreasonably dangerous condition at the time they left Defendants' possession.

65. The Pinnacle Devices were expected to and did reach the usual consumers, handlers and persons coming into contact with said products without substantial change in the condition in which they was designed, produced, manufactured, sold, distributed, and marketed by Defendants.

66. The Pinnacle Devices' unsafe, defective and unreasonably dangerous condition was a proximate, producing or other legal cause of injury to Plaintiff.

67. The Pinnacle Devices failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

68. Plaintiff's injuries resulted from use of the Pinnacle Devices that were both intended and reasonably foreseeable by Defendants.

69. The Pinnacle Devices posed a risk of danger inherent in their design which outweighed the benefits of that design.

70. The Pinnacle Devices were defective and unsafe, and Defendants knew or had reason to know that they were defective and unsafe, especially when used in the form and manner as provided by Defendants.

71. Defendants knew, or should have known, that the Pinnacle Devices were in a defective condition, and were and are unreasonably dangerous and unsafe.

72. At the time of the implantation of the Pinnacle Devices into the Plaintiff, the products were being used for the purposes and in a manner normally intended, namely for use as a hip replacement device.

73. Defendants, with this knowledge, voluntarily designed its Pinnacle Devices in a dangerous condition for use by the public and, in particular, the Plaintiff.

74. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

75. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers and to Plaintiff, in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

20

76. At all times herein mentioned, there was a safer alternative design that was both technologically and economically feasible which would have eliminated or substantially reduced the damage to the Plaintiff.

77. As a direct and proximate result of Defendants' placement of the defective Pinnacle Devices into the stream of commerce, Plaintiff experienced and will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life. Plaintiff also had revision surgeries to replace the devices on or about May 2, 2017 and September 19, 2017 and incurred medical expenses.

78. In performing the foregoing acts and omissions, Defendants acted with gross negligence, fraudulently and with malice so as to justify an award of punitive and exemplary damages.

## **NEGLIGENT MISREPRESENTATION**

79. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5, and 16 through 39 as if fully set forth herein.

80. Defendants made misrepresentations and omissions of material facts, including, but not limited to:

    a. That Plaintiff's implants were fit for their intended use;

    b. That Plaintiff's implants were of merchantable quality;

21

    c.   That Plaintiff's implants were safe and efficacious in the treatment of Plaintiff's medical condition;

    d.   That Plaintiff's implants would function as intended when necessary;

    e.   That Plaintiff's implants were not defective, such that they would fail to function as intended; and

    f.   That Plaintiff's implants were not unreasonably dangerous.

81. These representations and omissions were false and misleading at the time they were made.

82. Defendants negligently and carelessly made the foregoing misrepresentations without a basis.

83. Defendants were aware that they did not possess information on which to accurately base the foregoing representations and concealed from Plaintiff that there was no reasonable basis for making these representations.

84. When Defendants made these representations, they knew or should have known them to be false.

85. In reliance upon the misrepresentations by the Defendants, Plaintiff was induced to and did subject herself to the use of the Pinnacle Devices. If Plaintiff had known of the true facts, she would not have taken such action and risk. Plaintiff's reliance on Defendants' misrepresentations and omissions was reasonable because said representations were made by individuals and entities in a position to know the true facts.

86. As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff has suffered and will continue to suffer injury, expense and economic loss as previously described.

## **BREACH OF EXPRESS WARRANTY**

87. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5, and 16 through 39 as if fully set forth herein.

88. Defendants designed, manufactured, tested, marketed, and distributed into the stream of commerce the Pinnacle Devices.

89. Defendants expressly warranted that the Pinnacle Devices were safe and effective hip replacement systems.

90. The Pinnacle Devices placed into the stream of commerce by Defendants did not conform to these express representations because they failed early, as did Plaintiff's, thereby giving rise to unnecessary physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the devices with the attendant risks of complications and death from such further surgeries.

91. As a direct and proximate result of Defendants' breach of express warranties regarding the safety and effectiveness of the Pinnacle Devices, Plaintiff has suffered and will continue to suffer substantial damages.

## **BREACH OF IMPLIED WARRANTY**

92. Plaintiff adopts by reference and incorporates herein the allegations set forth in paragraphs 1 through 5, and 16 through 39 as if fully set forth herein.

93. Defendants are in the business of designing, manufacturing, supplying, and placing into the stream of commerce the Pinnacle Devices for consumers.

94. By placing the Pinnacle Devices into the stream of commerce, Defendants impliedly warranted that they were merchantable and fit and safe for their intended use.

95. The Pinnacle Devices placed into the stream of commerce by Defendants and implanted in Plaintiff were defective and accordingly, was not fit, safe or merchantable for their intended use.

96. The defects in the Pinnacle Devices designed, manufactured, supplied, and placed into the stream of commerce by Defendants were present at the time the products left Defendants' control.

97. Defendants breached the implied warranty for the Pinnacle Devices because they were defective, un-merchantable and not fit for their intended purpose.

98. Plaintiff was a foreseeable user of the Pinnacle Devices designed, manufactured, supplied, and placed into the stream of commerce by Defendants.

99. As a direct and proximate result of Defendants' breach of these implied warranties, Plaintiff has suffered and will continue to suffer injury, expense and economic loss as previously described, rendering Defendants liable for said damages.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment in favor of Plaintiff and against Defendants for the damages set forth below, along with court costs, pre-judgment and post-judgment interest, and for each cause of action;

1. pain and suffering (past and future);

2. wage loss (past and future);

3. loss of earnings and loss of earning capacity;

4. medical expenses (past and future);

5. loss of enjoyment of life (past and future);

6. mental anguish and distress (past and future);

7. disfigurement (past and future);

8. physical impairment (past and future);

9. attorney's fees;

10. Punitive damages if the court rules that  after the evidence is presented said damages may be considered by the jury, in such amounts as may be proven at trial; and

11. For all such other relief as to which Plaintiff may show herself justly entitled.

s/William M. Powell
William M. Powell, Esquire
Florida Bar #343994
Rita M. Jackman, Esquire
Florida Bar #107180
Powell, Jackman, Stevens & Ricciardi, P.A.
2050 McGregor Boulevard
Fort Myers, Florida 33901
(239) 689-1096 Phone
(239) 791-8132 Facsimile
william@lawinfo.pro
rjackman@your-advocates.org
ngargano@your-advocates.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of March, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all parties that are CM/ECF participants in this action.

s/William M. Powell
William M. Powell, Esquire
Florida Bar #343994
Rita M. Jackman, Esquire
Florida Bar #107180
Powell, Jackman, Stevens & Ricciardi, P.A.
2050 McGregor Boulevard
Fort Myers, Florida 33901
(239) 689-1096 Phone
(239) 791-8132 Facsimile
william@lawinfo.pro
rjackman@your-advocates.org
ngargano@your-advocates.org

26